UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

SUZANNE RENEE WALKER )
)
V. ) NO. 2:13-CV-103
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is an action for judicial review of the Commissioner's final decision denying the plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act following an administrative hearing before an Administrative Law Judge ["ALJ"]. The Plaintiff has filed a Motion for Judgement on the Pleadings [Doc. 13], and the defendant Commissioner filed a Motion for Summary Judgment [Doc. 19].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 40 years of age, a "younger individual" under the Social Security regulations at the time of her alleged disability onset date of November 7, 2006. She has a high school education. No one disputes her inability to return to any past relevant work. Her medical history is summarized in the Commissioner's brief as follows:

> Plaintiff had been treated in the past for scoliosis of the spine with a Harrington rod, and her condition was stable (Tr. 325-327). She saw Galen Smith, M.D., an orthopedic surgeon, on April 13, 2005, who noted that she had moderate degenerative disease of the lumbar spine (Tr. 326). He advised conservative treatment (Tr. 325). Dr. Smith referred Plaintiff to Aruna Shah, M.D., at Kingsport Family Health Center (Tr. 333). Plaintiff also complained of shoulder pain since November 2004, due to an injury (Tr. 366, 368).
> Plaintiff treated with Tina Killebrew, F.N.P., at Appalachian Medical Center beginning in October of 2006 (Tr. 409-412). Plaintiff's complaints and the objective findings were essentially the same at all of the office visits, and included complaints of lumbar back pain that was controlled with medications, and findings including symmetrical motor strength in the bilateral lower extremities with no sensory deficits; stiff gait; lumbar back tender with palpatation; decreased active range of motion and 3-4/5 strength; and thoracic back pain with palpation and active range of motion and 3-4/5 strength (Tr. 409-412, 455-461, 512-583). Ms. Killebrew did not suggest any imaging studies to determine the etiology of Plaintiff's pain and merely treated the subjective complaints (409-412, 455-461, 512-583).
> Samuel Breeding, M.D., evaluated Plaintiff on May 7, 2007 (Tr. 415-419). He noted that Plaintiff quit her job in North Carolina to return to Tennessee to care for her father (Tr. 415). Dr. Breeding indicated Plaintiff's gait was slow but her station was normal, that she had a well healed surgical scar, straight leg raise while sitting was negative at 90 degrees and lumbar forward flexion was 45 degrees, extension was 0 degrees, there were no sensory deficits, and x-ray of the lumbar spine showed advanced degenerative changes involving L4-5 disc space and minimal degenerative changes elsewhere (Tr. 415-419). Dr. Breeding assessed low back pain with history of scoliosis and Harrington rod placement and assessed that Plaintiff could lift 10 pounds occasionally and could sit for four to six hours in an eight hour day, could stand for two to four hours in an eight hour day, but should be allowed to

2

sit or stand as needed (Tr. 417). Her back was fine until around June 2005, when she started taking pain medications (Tr. 415).

Steven Lawhon, Psy.D., a licensed clinical psychologist, evaluated Plaintiff on May 8, 2007 (Tr. 421-424). He opined that the Plaintiff had anxiety disorder not otherwise specified, depression due to medical reasons, back pain, and that her present GAF was 58 and her past GAF had been 70 (Tr. 421-424). He opined that her ability to understand and remember was not significantly limited, her ability to sustain concentration and persistence was moderately limited, her social interaction was not significantly limited, and her work adaptation was mildly to moderately limited (Tr. 423).

State agency psychological consultant C. Warren Thompson, Ph.D., opined on June 8, 2007, that Plaintiff had affective disorder and anxiety related disorder (Tr. 426). He opined that the Plaintiff had moderate difficulties in maintaining concentration, persistence or pace and mild difficulties in activities of daily living, and maintaining social functioning, and no episodes of decompensation (Tr. 436). He opined that her impairments resulted in mild to moderate limits and that she was capable and credible (Tr. 438). He further determined that she was moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and to be punctual within customary tolerances to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods and to respond appropriately to changes in the work setting (Tr. 440-441). Plaintiff could remember and understand simple and detailed instructions, and would have some but not substantial difficulty maintaining concentration, persistence or pace, could interact effectively with others, and would have difficulty adapting to change but still
could do so (Tr. 442).

A state agency reviewing physician, Celia M. Gulbenk, M.D., opined on June 13, 2007, that Plaintiff could occasionally lift up to 20 pounds, could frequently lift 10 pounds, could stand and/or walk for about six hours in an eight hour work day, and could sit about six hours in an eight hour work day (Tr. 445). She opined that Dr. Breeding's assessment was not supported by his findings on exam nor by the medical evidence of record (Tr. 450). She opined that the Plaintiff has severe back impairments, short of the listings, and that she was not fully credible given findings on exam, and that her shoulder complaints would not affect her residual functional capacity (Tr. 451).

Plaintiff was followed by the Appalachian Medical Center and in July 2007, it was noted that the Plaintiff had scoliosis, degenerative disc disease, osteoarthritis, degenerative joint disease at multiple sites, poison ivy, low back pain and anxiety disorder (Tr. 455).

Another state agency reviewing physician, Joe G. Allison, M.D., opined in October 2007 that Plaintiff could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand and/or walk with normal breaks for six hours in an eight-hour work day, and could sit for about six hours in an eight hour work day (Tr. 466). He further opined that the Plaintiff could never climb ladders, ropes or scaffolds or crawl, but that she could occasionally climb ramps or stairs,
balance, stoop, kneel or crouch (Tr. 467).

State agency psychological consultant, Rebecca P. Joslin, Ed.D, opined on October 18, 2007, that Plaintiff had moderate difficulties in maintaining social functioning, but only mild restrictions of activities of daily living or difficulties in maintaining concentration, persistence or pace, and had no episodes of decompensation (Tr. 483). She indicated that Plaintiff was credible and capable and that most of her limits were physical and that her opinion was consistent with the medical assessment (Tr. 485). She stated that Plaintiff was moderately limited in her ability to interact appropriately with the general public, to get

3

along with co-workers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting (Tr.488). Plaintiff was able to understand and remember simple and detailed instructions, could maintain attention, concentration, persistence or pace, and was able, with some difficulty, to interact appropriately with the general public and with others without extremes and could adapt with some difficulty to changes (Tr. 489).

Ms. Killebrew[1] opined in October of 2008, that Plaintiff could occasionally lift 10 pounds, could frequently lift five pounds due to her Harrington rod, her osteoarthritis and degenerative disk disease, her scoliosis and lumbago, as well as her anxiety and depression. She thought that the Plaintiff could walk one hour during a day and could sit for a total of two hours because of those conditions (Tr. 508). She did not believe that the Plaintiff could ever climb, stoop, kneel, crouch or crawl, and could occasionally kneel and had difficulty reaching, handling, pushing and pulling, but had no difficulty in feeling, seeing, hearing or speaking and she also had environmental restrictions (Tr. 509). Ms. Killebrew further opined the Plaintiff had no useful ability to deal with work stresses, and had a seriously limited but not precluded ability to interact with supervisors, use judgment in the public, function independently, and maintain attention and concentration (Tr. 510). She also thought that the Plaintiff had seriously limited but not precluded ability to understand, remember and carry out complex and detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations (Tr. 511).

Plaintiff was evaluated by Beth Ballard, M.A., and Diane Whitehead, Ph.D., a licensed clinical psychologist, on May 13, 2011 (Tr. 618-627). On the WAIS-IV, she obtained a verbal comprehension index of 96, a perceptual reasoning index of 92, a working memory index of 77, and a processing speed index of 71. She therefore had a full scale IQ of 82, which was within the low average range of intelligence although depression possibly interfered with her working memory and her processing speed (Tr. 621). A test of memory malingering showed no malingering or mental difficulties, and Ms. Ballard and Dr. Whitehead diagnosed the Plaintiff with dysthymic disorder, panic disorder without agoraphobia, degenerative disk disease, and a GAF of 55, with the highest within the past six months estimated at 65 and the lowest at 55 (Tr. 623). Plaintiff was moderately limited in her ability to understand and remember complex instructions, carry out complex instructions, and to make judgment on complex work-related decisions (Tr. 625). Plaintiff had mild limitations in her ability to interact appropriately with supervisors, co-workers, and to respond appropriately at usual work changes, but it was noted that her symptoms of depression and anxiety would interfere with her relationships in employment settings and she was likely to misinterpret cues from her supervisors and colleagues due to her depression and anxiety (Tr. 626).

On August 12, 2011, Plaintiff presented for a State agency consultative examination with Jeffrey Uzzle, M.D., an orthopedist, for an exam, including x-rays of her right ankle and thoracolumbar spine (Tr. 629-643). Two-view rays of the right ankle were negative. The visible bones of the right ankle, lower leg, and right foot are normal without evidence of fracture, deformity, or any osteoarthritic deformities. Noted was possible beginning of a small calcaneal spur at the plantar fascia insertion, but she was not having related symptoms. Two views standing x-rays of the thoracolumbar showed a single Harrington rod to the left going from the T3-4 interspace down to L2 with no evidence of hardware failure. There continued to be mild scoliosis curvature. There were moderate lumbar spondylosis changes at L2-3, L3-4, and L4-5. Dr. Uzzle noted there was a scar over her thoracolumbar spine

---

[1] Nurse Practitioner Tina Killebrew, who treated the plaintiff.

posteriorly and over her right posterior pelvis from previous thoracolumbar scoliosis and fusion surgery. She did not use anyassistive devices, and Dr. Uzzle noted she was suffering from a rather severe appearing poison ivy outbreak over her right face and right head. Plaintiff's stationary standing balance was normal and her gait pattern was normal. She had some mild difficulty with tiptoe walking on the right, possibly indicating some mild right lower extremity weakness. She denied any joint pain in the right lower extremity. She was able to heel walk without difficulty and perform a deep knee bend without difficulty. She had negative sitting and supine straight leg raise for radiculopathy in the lower extremities bilaterally. A neurological exam showed normal strength, sensation, and reflexes throughout all four limbs. Dr. Uzzle did not detect any myotomal or neurological weakness of the right lower extremity compared to the left. Plaintiff had negative Hoffman, clonus, and Babinski bilaterally. There was no atrophy in the four limbs, and her thigh and calf circumferences were symmetrical. The only deformity Dr. Uzzle observed on the skeletal survey was that of her mild residual scoliosis and prior scoliosis reduction surgery. Her pedal and radial pulses were intact. She did have thoracolumbar pain with thoracolumbar range of motion at 60 degrees of flexion, 10 degrees of extension, 10 degrees bilateral side bending. She said it was right side bending that was her most painful direction of movement. Otherwise, she had full pain-free range of motion in the neck and in all four limbs. Dr. Uzzle noted Plaintiff was getting chronic pain management for chronic neck and back pain. More recently, she had had some right lower extremity pain and numbness that could be sciatica or referred pain from her back, but she did not have any evidence of radiculopathy in the lower extremities on examination. In addition, there were no neurological deficits of the lower extremities. Dr. Uzzle indicated that though she could have had some mild subclinical weakness making it difficult for her to tiptoe walk on the right, there was also evidence of a mild early heel spur from plantar fascia insertion to the right calcaneus on x-ray, but this was not symptomatic as she was not tender there. She had had major scoliosis corrective surgery back in 1980 [1979] and continued
to have chronic diffuse axial pain. She had pain and limitations on dorsolumbar spine range of motion which was not unexpected given the nature of her scoliosis surgery (Tr. 629-643).

Dr. Uzzle opined that Plaintiff could occasionally lift up to 20 pounds, and could frequently lift up to 10 pounds (Tr. 634). He thought that she could sit for two hours at a time, could stand or walk for up to two hours at a time and could sit for a total of six to eight hours, could stand for a total of three to four hours, and could walk for a total of three to four hours, and she did not require a cane to ambulate (Tr. 635). He opined that Plaintiff could frequently reach overhead with her right hand but could continually reach, handle, finger, feel and push and pull with both extremities (Tr. 636). He believed that the Plaintiff could occasionally climb stairs, ramps, ladders and scaffolds, balance, stoop, kneel, crouch, and crawl (Tr. 637). He thought that she could occasionally be around unprotected heights, moving mechanical parts, and operate a motor vehicle or be around vibrations, and could continuously deal with humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat (Tr. 638).

At the hearing in December 2011, a medical expert, Theron Blickenstaff, M.D., who was Board-certified in general preventive medicine and occupational medicine, appeared and testified (Tr. 46- 50). He noted there was objective evidence of scoliosis of the spine which seemed to be stable and which probably did not cause a huge amount of impairment (Tr. 47). Plaintiff also had degenerative disk disease of the lumbar spine shown on imaging studies, as well as a torn rotator cuff (Tr. 47). He noted that an exam had noted decreased range of motion of the back which was consistent with residual scoliosis (Tr. 47). He opined that the objective evidence would call for an overall exertional limit of lifting no more than 25 pounds occasionally, 10 pounds frequently, and no more than occasional overhead work with

5

the right upper extremity, no more than occasional climbing of ladders, ropes, or scaffolds, and no more than occasional bending or stooping (Tr. 48). Other physical limitations would depend on the credibility of the subjective complaints (Tr. 48). He did not believe the scoliosis would cause much in the way of symptoms and that most people did not have much in the way of symptoms with the surgery the Plaintiff had, but that symptoms of degenerative disk disease were highly variable and some people had a lot of pain and others did not (Tr. 49). Because of Plaintiff's breathing difficulties, he thought that she should not be exposed to high levels of vapors, fumes and dust, but did not give a limitation beyond that (Tr. 49).

[Doc. 20, pgs. 2-9].

In his hearing decision, the ALJ noted that the case had been remanded by the Appeals Council following an adverse decision by a different ALJ. In that prior hearing decision, that ALJ found the plaintiff had the residual functional capacity ["RFC"] to lift and carry 20 pounds occasionally and 10 pounds frequently, to stand and walk for 6 hours in an 8 hour workday, to sit for 6 hours in an 8 hour workday, with an emotion disorder with mild to moderate restrictions in her ability to perform work related activities. (Tr. 110). The Appeals Council found that the prior decision was defective in various respects. First, it did "not explain which findings" from an even earlier adverse decision "remain binding." Second, the RFC and question to VE in that decision did not adequately evaluate the effect on the plaintiff's ability to perform work-related activities occasioned by her "mild to moderate" mental limitations. Third, even though the ALJ asked the VE if the jobs identified in that hearing comported with the Dictionary of Occupational Titles ["DOT"], the Appeals Council noted that some of the jobs were nevertheless at odds with the DOT. Upon remand, the ALJ was to consider new evidence from Nurse Tina Killebrew and deal with the cited errors. The ALJ was instructed, "as appropriate," to obtain updated medical records from treating sources, and, if necessary, obtain consultative examiners. Also "if necessary," the ALJ was instructed to utilize a "medical expert to clarify the nature and severity of the

6

claimant's impairments." He was then to "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." Finally "before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and..." the DOT. (Tr. 116-118).

At the administrative hearing which led to the decision under review here, the ALJ took the testimony of Ms. Sharon Cornett, a Vocational Expert ["VE"]. The ALJ asked her "to assume that the claimant is a younger individual...she has a 12th grade education...she is limited as Dr. Blickenstaff has opined, which he said 25 pounds occasionally, can balance frequently, occasional overhead with the right upper extremity, occasional climbing ladders, ropes, scaffolds, and bending and stooping. Also should not be around high levels of fumes and vapors. In addiont, she has the ability to maintain attention, concentration, remember simple and detailed instructions, interact appropriately with the general public and adapt to changes. In addition, she would be able to satisfactorily get along with coworkers and supervisors." He then asked if there would be jobs the plaintiff "could perform in the region or national economies?" Ms. Cornett stated there would be jobs as an interviewer, with 978 regional jobs and 19, 407 in the nation; an information clerk, with 839 in the region and 48, 200 in the nation; a hand packer, with 113 in the region and 6,800 in the nation; an inspector/sorter with 189 in the region and 6,000 in the nation; and as a filling machine operator with 17 in the region and 897 in the nation. Her use of the term "region" was to identify the State of Tennessee. He did not ask the VE if the identified jobs were compatible with the DOT. (Tr. 51-52).

In the hearing decision, the ALJ found that the plaintiff's insured status expired on

December 31, 2009, and that she had not engaged in substantial gainful activity since her alleged onset date of November 7, 2006. He found that she had severe impairments of degenerative disc disease, right shoulder problems, chronic obstructive pulmonary disease, depression and anxiety, and no impairments which met or equaled a "listed impairment." (Tr. 25). In analyzing the latter finding, the ALJ made findings relative to the degree of limitation in various categories relating to her mental impairments. He found that she had a mild restriction in activities of daily living, and in social functioning. He found she had moderate difficulties in regard to concentration, persistence and pace, but that "she can sustain focused attention and concentration sufficiently enough to permit the timely and appropriate completion of tasks commonly found in simple and detailed work settings." (Tr. 26).

He then identified her residual functional capacity ["RFC"], finding the plaintiff could "lift 25 pounds occasionally, 10 pounds frequently with no more than occasional overhead work with the right upper extremity. She can occasionally climb ladders, ropes and scaffolds, bend and stoop. She should not be exposed to high levels of vapors, fumes and dust. She has the ability to maintain attention and concentration, and remember simple and detailed instructions; interact appropriately with the public and adapt to changes. In addition, she is able to get along with co-workers and supervisors satisfactorily." (Tr. 27). He then mentioned the opinions of Dr. Blickenstaff, the medical expert who testified at the hearing, who was the primary basis for the physical limitations set forth in the RFC, stating that those impairments "can best be summarized and evaluated by Dr. Blickenstaff's testimony." (Tr. 28).

The ALJ then spent several pages discussing the various treating sources, the

consultative examinations, and the assessments of the State Agency physicians, comparing them to Dr. Blickenstaff's opinions (Tr. 28-30). He noted that Dr. Blickenstaff indicated he could not cite and "specific inconsistencies" involving plaintiff's subjective complaints, but emphasized Dr. Blickenstaff's overall opinion that if plaintiff's physical condition had worsened over time there would be more evidence of it than there was in the medical records. The ALJ then stated that despite the limited objective evidence, he was giving "the claimant the benefit of every doubt" in limiting her to his physical RFC (Tr. 30).

The ALJ then discussed the history of her right shoulder pain. He noted she had not complained of that pain prior to September 25, 2007, and did not complain of it again until September 21, 2009. He stated that by the time of Dr. Uzzle's consultative exam in August of 2011, the plaintiff's right shoulder had a normal range of motion and was pain free. He then stated that even though that condition had resolved, he was giving the plaintiff the benefit of the doubt in limiting her overhead work (Tr. 30-31).

In discussing her COPD, he noted that Dr. Blickenstaff pointed out no pulmonary function studies or abnormal chest x-rays. Noting that the plaintiff still smoked, he nonetheless again gave her the "benefit of doubt in limiting claimant to work involving no exposure to high levels of vapors, fumes and dust...." (Tr. 31).

Noting that plaintiff did not initially claim to have a mental health disorder as a basis for disability when she first filed her applications, he discussed her course in the interim. He noted that Nurse Killebrew's notes indicated plaintiff saying at every visit that "her medications were controlling her anxiety and she did not report any adverse side effects to the medication." (Tr. 31). He then discussed the various consultative examinations, State

9

Agency psychological reports, and other treatment, in which medications again had the desired effect. (Tr. 31-33).

He then discussed plaintiff's credibility, finding her "statements concerning the intensity, persistence and limiting effects of [her] symptoms...not credible to the extent they are inconsistent with the above residual functional capacity assessment." He noted "inconsistent statements" to providers and examiners. These were, first, a statement to Dr. Breeding that plaintiff "ceased treatment with Dr. Galen Smith due to loss of insurance; however, Dr. Smith's records document that he returned the claimant to Dr. Aumah Shah for further non-operative care. In addition, the claimant reported to Mr. Brian Plant in July 2010...that she was being treated by Dr. Galen Smith for her back; however, the claimant had not been treated by Dr. Smith since April 15, 2005." He also mentioned the plaintiff's complaints about her medications, when the medical records showed that they helped her pain and anxiety. Discussing her limited daily activities, the ALJ did not consider them "to be strong evidence in favor of finding the claimant disabled." He said this because her limited daily activities "could not be objectively verified with any degree of certainty," and because he did not believe the objective medical evidence supported that degree of limitation. He also noted her numerous treatments for poison ivy, which he said indicated "she gets out more than alleged," and her hurting her neck and left shoulder "while mopping." (Tr. 33-34).

He went on to describe her conservative treatment, and lack of mental health counseling until January of 2011. Her statements that she could not afford such treatment was refuted by the ALJ by pointing out that there were "pay-as-able" services available and that her cigarette smoking and the attendant expense continued even though she alleged she

10

could not afford any mental health treatment. For all of these reasons, he found her to be not credible. (Tr. 34).

He then discussed the weight he assigned to the various experts' opinions. He gave great weight to Dr. Blickenstaff, the medical expert who testified at the hearing after reading plaintiff's medical records, and upon whose testimony he based his physical RFC finding. He rejected Dr. Breeding's examination report, finding it was "not supported by the findings on examination or the longitudinal medical evidence of record." (Tr. 34).

The ALJ gave great weight to psychological examiner Lawhon regarding his opinion that plaintiff had moderate restrictions in concentration and persistence, and no limitations in social interaction. However, he found plaintiff more limited than Lawhon regarding her ability to understand and remember and in work adaptation, finding a moderate limitation regarding the former and no limitations regarding the latter. (Tr. 34-35).

He then "concurred" with the State Agency psychologist's report from June 8, 2007, which is somewhat curious since that psychologist opined that plaintiff "will have some difficulty adapting to change but still can do." This is curious because he had just found that the plaintiff had no limitations regarding work limitations. He gave no weight to the State Agency doctors who opined on the plaintiff's physical capabilities on June 13, 2007 and October 4, 2007 to the effect that plaintiff could only perform a reduced range of light work, finding "they are too restrictive based on the objective medical evidence and inconsistent with the record as a whole." Regarding the State Agency psychologist report dated October 18, 2007, the ALJ concurred that the plaintiff could understand and remember simple and detailed tasks, but disagreed with that report where it stated she would have moderate

11

difficulties in social functioning and adaptation. He rejected the physical and mental assessments of plaintiff's treating nurse, Tina Killebrew, because she was not an acceptable medical source and because her opinion was not consistent with the medical records. He also noted that "Ms Killebrew's nursing licence was suspended...due to failure to accurately assess, diagnose and treat actual medical conditions, and for diagnosing and treating conditions that are not substantiated through the patient's medical records." He totally agreed with the assessment of Ms. Ballard and Dr. Whitehead. (Tr. 35).

Regarding the physical assessment of Dr. Uzzle, the ALJ gave it some weight, although the ALJ in his RFC found that the plaintiff could occasionally lift up to 25 pounds, 5 more than Dr. Uzzle (Tr. 35-36).

The ALJ then found that the plaintiff could not perform any of her past relevant jobs. Given her age, education, and work experience, he found that there was a significant number of jobs in the national economy which plaintiff could perform, namely the jobs identified by the VE set forth hereinabove. Accordingly, he found that she was not disabled (Tr. 36-37).

Plaintiff asserts that the ALJ erred in both the physical and mental aspects of his hypothetical to the VE. First, plaintiff asserts that the ALJ left out Dr. Blickenstaff's opinion that the plaintiff could frequently lift 10 pounds in his question to the VE. What the ALJ actually asked was that the VE assume "she is limited as Dr. Blickenstaff has opined, which he said 25 pounds occasionally...." The VE was present for Dr. Blickenstaff's testimony, which preceded hers by only a few minutes. In the context of the hearing, the Court is comfortable in concluding that the VE understood plaintiff's lifting capabilities as opined by Dr. Blickenstaff.

Also, almost all of the physical abilities and limitations opined by Dr. Blickenstaff have other opinions in the record to support them. For example, the ability to stand or walk for 6 hours and to sit for 6 hours is set forth in the assessments of the State Agency physicians (Tr. 441-454, 465-472). The occasional use of scaffolds and ladders, which is the only noteworthy difference from those of the State Agency physicians who opined plaintiff could never do this, is contained in the opinion of consultative examiner Dr. Uzzle (Tr. 629-643). The only ability opined by Dr. Blickenstaff for which another underlying medical opinion cannot be found, at least by this Court, is that plaintiff could occasionally lift 25 pounds, when the State Agency physicians and Dr. Uzzle opined that she could lift 20 pounds. However, the Court does not believe that this minor difference is reversible error. The Court is not aware of such an odd number of pounds to be lifted to be a factor anywhere in the Social Security regulations, the Dictionary of Occupational Titles, or vocational science in general. While it might have relevance if a plaintiff were found to be capable of past relevant work, where lifting a 25 pound weight was a condition of the job, that does not appear to be the case with respect to the jobs identified by the VE. Likewise, if all sources except for Blickenstaff opined she could only lift a maximum of less than 20 pounds, then this would cause concern. Thus, the Court finds underpinnings in the record for Dr. Blickenstaff's opinions.

The plaintiff also asserts that the ALJ erred with respect to his treatment of Dr. Blickenstaff's opinion because the ALJ allegedly ignored Dr. Blickenstaff's statement that "other physical limitations would depend on the credibility of the subjective complaints." (Tr. 48). This is, of course, not an earth shaking statement on the part of the medical expert.

13

In virtually every case, there exists a possibility that if the plaintiff is entirely credible about their subjective complaints, they may well be disabled. Plaintiff is actually arguing the traditional and perfectly appropriate argument that the ALJ erred in assessing her credibility. He in fact did find her not to be totally credible, but he stated the reasons he came to this conclusion. In that regard, he referred to her "essentially routine and conservative" treatment for her conditions. He pointed out that she stated she could not afford treatment while he noted that treatment was available to people who met the criteria of the applicable source. He noted in this regard that she continued the expensive habit of smoking while claiming an inability to pay for any treatment. These are all evidence which a finder of fact such as the ALJ can utilize. His credibility finding cannot be lightly set aside, and the Court sees no basis to do so here.

Plaintiff also asserts that the ALJ erred in giving "no weight" to the State Agency physicians. While the Court is not exactly certain why the ALJ used the term "no weight," as stated above, portions of their opinions, particularly regarding standing and walking and sitting, support the requirements in those areas for light work. Irrespective of the weight assigned, those opinions support the ALJ's RFC finding and the hypothetical given to the VE.

Plaintiff states that the ALJ erred in his assigning no weight to Nurse Killebrew's opinions, when the Appeals Council instructed him to "consider [that] new evidence and take appropriate action..." (Tr.118). In point of fact, he did consider her opinions. He found her opinions were "not consistent with the objective medical evidence of record" which he had already discussed. He also took into account the fact that Nurse Killebrew's nursing licence

14

was suspended "in part, due to failure to accurately assess, diagnose and treat actual medical conditions, and for diagnosing and treating conditions that are not substantiated through the patient's medical records." (Tr. 35). Being entitled to no deferential weight, these were both valid bases for rejecting her opinions. The Appeals Council found no fault with the ALJ in this, or any other regard. (Tr. 4-6).

Plaintiff's last argument regarding the ALJ's physical RFC findings is that all other examiners, in one way or another, found the plaintiff more limited than Dr. Blickenstaff. As pointed out earlier, there are findings from the various examining and evaluating sources for each component of Blickenstaff's opinion, except for 5 additional pounds in occasional weight that plaintiff could lift. This argument has no merit.

From a mental limitation perspective, the plaintiff asserts that the ALJ erred because he did include specific limitations on the plaintiff's ability to maintain concentration and persistence in his question to the VE when he found she had moderate limitations in those respects. His question stated "she has the ability to maintain attention, concentration, remember simple and detailed instructions, interact appropriately with the general public and adapt to changes...." (Tr. 51). The ALJ explained this determination in his discussion of the great weight to the opinion of the consultative mental examiner Beth Ballard. He stated that the plaintiff had moderate limitations, which was "more than a slight limitation," but that plaintiff "could still function satisfactorily..." (Tr. 35). Indeed, that is the definition of a "moderate" limitation on the evaluation form used by Ms. Ballard. (Tr. 625). "Satisfactorily" means what it says, and it would not prevent the plaintiff from functioning adequately in these respects.

15

The plaintiff also asserts that the number of jobs identified was not "significant." The VE identified 1, 556 jobs in the region (State of Tennessee) and 81,804 jobs in the nation. The rationale for deciding this issue is contained in the case of *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988). As pointed out by the Court, "'work which exists in the national economy' means work that exists in significant numbers either in the region where such individual lives or in several regions of the country.'" *Id.,* at 275 citing 42 U.S.C. §423(d)(2)(A). The Court then quoted the regulations which states "work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy. We will not deny you benefits on the basis of the existence of these kinds of jobs." *Id.*, citing 20 C.F.R. §404.1566(b).

The Court then stated that it was not "blind...to the difficult task of enumerating exactly what constitutes a 'significant number.' We know that we cannot set forth one special number which is to be the boundary between a 'significant number' and an insignificant number of jobs." The Court did state, as asserted by the plaintiff, that the ALJ should consider "many criteria...some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony;..." etc.[2] In the end, the Court stated "the decision should ultimately be left to the

---

[2]With the utmost respect, none of these criteria are very helpful, since the ALJ would have resolved all of them in favor of the Commissioner to even reach the point of asking a question of a vocational expert.

16

trial judge's common sense..." in defining this term within the facts of any particular case. The Court concluded that the District Judge erred in finding that 1, 350 jobs was an insignificant number. *Id.*

Using the guidance of the regulation quoted above, "common sense" would dictate that the jobs identified by the VE are not "exotic" or clumped together in a distant region of the country. Recognizing that this is a small number of jobs, small is not the test for significance. The Court is unaware of a sustained reversal of the Commissioner's findings in the "ballpark" of this number. Various cases from other circuits have held far lower numbers to be "significant." *See, Johnson v. Chater,* 108 F.3d 178, 180 (8th Cir. 1997); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987).

Finally, the plaintiff asserts that the ALJ erred by failing to ask the VE whether the jobs she identified which a person with the plaintiff's RFC could perform complied with the *Dictionary of Occupational Titles* ["DOT"], as required by *Social Security Ruling 00-04p*. The defendant apparently missed this argument in plaintiff's brief and did not respond.

The ALJ did err. The regulation *requires* that "at the hearing level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, **on the record** as to whether or not there is such consistency." The ALJ did not do that. The only question is whether the error was harmless.

Sixth Circuit precedent makes it clear that it can be harmless error for an ALJ to fail to ask the required question. *See*, *Johnson v. Commissioner of Soc. Sec.* 535 Fed. Appx. 498 (6th Cir. 2013). Admittedly, this is a different situation from *Johnson*. In that case, the ALJ did not ask the question, but the plaintiff's attorney *did ask* that VE the source of his

17

opinions, and the VE said it was the DOT. When the attorney failed to ask about or point out any discrepancy with the DOT, the Sixth Circuit found the error harmless.

In the present case, counsel for the plaintiff, who extensively cross-examined the VE, did not ask whether there was any conflict, or what those conflicts might have been. In the plaintiff's brief, there is likewise no showing of any discrepancy. It is uncovering the presence of discrepancies, which would call into question a VE's accuracy, that is the purpose of SSR 00-04p. With no allegation that any discrepancy was actually at play, the Court finds the error harmless.

There was substantial evidence to support the ALJ's findings, he committed no reversible errors of law. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 13] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 19] be GRANTED.[3]

Respectfully submitted,

s/ Dennis H. Inman
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).